Larry PRICE, Plaintiff–Appellant,

v.

James M. SASSER; Ted Tadlock; Leroy Locklear, Jail Administrator of Wayne County; Board of Commissioners of Wayne County; County of Wayne, Defendants–Appellees,

and

Wayne County Jail; Wayne County Sheriff Department, Defendants.

No. 94–6886.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1995.

Decided Sept. 19, 1995.

---

## OPINION

ERVIN, Chief Judge:

■ Larry Wade Price, a prisoner who was assaulted by two other inmates at the Wayne County Jail, appeals the dismissal of his § 1983 action against Deputy Sheriff Ted Tadlock. Price alleges that Tadlock violated his Eighth Amendment rights by exhibiting deliberate indifference to a substantial risk of serious harm posed by the threat of assault. Because we agree with the district court that Tadlock is shielded from liability by the defense of qualified immunity, we affirm the grant of summary judgment on that ground.

### I.

In 1979, Larry Price was convicted of two counts of second degree murder and of discharging a firearm into an occupied dwelling. From January 16 through March 15, 1990, Price was held in the Wayne County, North Carolina, jail pending the disposition of his Motion for Appropriate Relief in the local Superior Court. During this time, the jail experienced significant problems with overcrowding. On every day but one, the male population housed in the jail was at or above its rated capacity of 88 persons. At times, the number of inmates reached as high as 138, well above the overall 100–bed capacity. By March 1, overcrowding had become such a problem that the facility ceased to follow its system for classifying and segregating inmates according to age, sex, type of crime, and pre- or post-conviction status. The policy of housing inmates with disciplinary problems in one of the jail's eight single cells also was ignored frequently because of the space constraints. If a problem arose, jail officials would make an ad hoc decision regarding which prisoner should be returned to the general prison population.

In addition to the overcrowded conditions, inmates Harold Austin and Andre Warren had been involved in various threatening incidents. Sometime after January 16, 1990, Austin was placed in a single cell for disciplinary reasons. When jail officials decided they needed that cell for another prisoner in late January or early February, Austin was placed in cellblock A, where Price was housed. Prior to March 2, Warren was housed in cellblock D. After assaulting and robbing two young prisoners, Warren was

**ARGUED:** James A. Crouch, North Carolina Prisoner Legal Services, Inc., Raleigh, NC, for appellant. Thomas M. Van Camp, Van Camp, West, Hayes & Meacham, P.A., Carthage, NC, for appellees.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and WILLIAMS, United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MURNAGHAN and Judge WILLIAMS joined.

moved to cellblock C. When Warren assaulted yet another prisoner there, he was moved to cellblock F. Finally, on March 2, Warren joined Austin and Price as a resident of cellblock A.

In early March, Price notified Tadlock on at least two separate occasions that Austin and Warren were causing problems in cellblock A. First, Price told Tadlock that the two were throwing water and setting fires. Later, he warned Tadlock that Warren "was causing a lot of tension" and that someone was going to get hurt. Price also claims that he gave a deputy a note for Tadlock which indicated that Warren was taking food from the other inmates. In addition, inmate Paul Newsome, also a resident of cellblock A, requested sick call on four separate occasions over a fourteen day period in order to notify the jailers that Austin and Warren had caused him to fear for his life. On the fourth occasion, Newsome spoke with Tadlock directly, informing him that Austin and Warren had a pocket knife and were threatening other inmates with a razor attached to a toothbrush. Tadlock responded:

Where can I put them? I can't put them in a corner cell because we don't have the space. I can't put them in another block because there is no room on the floors. We will try to do something directly.

At approximately 11:00 a.m. on March 15, Price was escorted to see the jail doctor by Deputy Sheriff James Tadlock. When he returned some twenty minutes later, another prisoner, Michael Meyers, informed Price that inmates Austin and Warren had taken some money from Price's cell while he was away. Neither Price nor Meyers informed Deputy Tadlock of the incident. After Tadlock left the area, Price confronted Austin and demanded that his money be returned. Austin then struck Price, and the two men wrestled to the ground. Inmate Warren then began striking Price, who fled to his cell and yelled for help. The assault continued until Price could no longer hold himself up. After being informed of a commotion in the cellblock, Tadlock returned to Price's cell. Price was eventually taken to Central Prison hospital for treatment. As a result of the assault, Price suffered several broken bones in his face, a partial loss of sight in his right eye, and a partial loss of hearing in his right ear.

Based on the events just described, Price initiated an action pursuant to 42 U.S.C. § 1983 in the United States District Court for the Eastern District of North Carolina. The *pro se* complaint, filed on April 8, 1992, named Wayne County Sheriff James Sasser as the defendant. On March 3, 1993, North Carolina Prisoner Legal Services filed an amended complaint on Price's behalf. It alleged that Sheriff Sasser, Deputy Sheriff Tadlock, Chief Jailer Leroy Locklear, the County of Wayne, and the Wayne County Board of Commissioners had violated Price's Eighth Amendment right to be free from violence at the hands of other inmates.

On February 1, 1994, the defendants moved for summary judgment. Four months later, a magistrate judge issued a Memorandum and Recommendation suggesting that the motion for summary judgment be granted and that Price's action be dismissed. The magistrate judge concluded that Price had suffered serious injuries, but that the evidence he presented did not create a genuine issue of material fact regarding a substantial risk of harm in the Wayne County jail to which the defendants had been deliberately indifferent. The magistrate judge also determined that, in any event, the defendants were entitled to qualified immunity.

On July 26, 1994, the district court adopted the magistrate judge's recommendation and findings, thereby granting defendants' motion for summary judgment and dismissing Price's action. Price appeals only the court's dismissal of his failure to protect claim against defendant Tadlock. *See* Brief of Appellant at 4 n. 1. Jurisdiction is proper under 28 U.S.C. §§ 1343(a)(3) and 1291.

## II.

■ We review the district court's grant of summary judgment *de novo*. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994); *Ramos v. Southern Md. Elec. Cooperative, Inc.*, 996 F.2d 52, 53 (4th Cir.1993). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir.

1990). In making this determination, we view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990). "If, however, 'the evidence is so one-sided that one party must prevail as a matter of law,' we must affirm the grant of summary judgment in that party's favor." *O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ We examine first the threshold question of whether Tadlock is entitled to the defense of qualified immunity. *See Korb v. Lehman,* 919 F.2d 243, 246 (4th Cir.1990). "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *accord Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995) (en banc). The right must be established in more than a general way: "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). At bottom, "[t]he central question in determining the issue of qualified immunity is whether or not the conduct of the government official violated 'clearly established law,' *i.e.,* the ' "objective legal reasonableness" of [his] action ... assessed in light of the legal rules that were "clearly established" at the time it was taken....' " *Korb,* 919 F.2d at 246 (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)).

■ The right implicated in this case is the Eighth Amendment right to be free from violence at the hands of other inmates. *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (noting that prison officials must "take reasonable measures to guarantee the safety of the inmates"). The United States Supreme Court recently elaborated on the parameters of this right in *Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994), in which the Court held that " 'prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.' " *Id.* at —, 114 S.Ct. at 1977 (quoting *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988)). The Court clarified that an inmate raising this type of Eighth Amendment claim must meet two requirements in order to establish a prima facie case. First, "the deprivation alleged must be, objectively, 'sufficiently serious'.... For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at —, 114 S.Ct. at 1977 (citations omitted); *accord Taylor v. Freeman,* 34 F.3d 266, 271 (4th Cir.1994). Second, the prison official must have acted with a "sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer,* — U.S. at —, 114 S.Ct. at 1977 (citations omitted); *accord Taylor,* 34 F.3d at 271.

■ According to the *Farmer* Court, deliberate indifference is "something more than mere negligence," but less than acts or omissions undertaken *for the very purpose of causing harm,* or with knowledge that harm will result. *Id.* at —, 114 S.Ct. at 1978. Specifically, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at —, 114 S.Ct. at 1981. Furthermore, a prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner

who eventually committed the assault." *Id.* at ——, 114 S.Ct. at 1982.

■ At the time of the events in question, however, *Farmer* had not been decided, and the law governing failure to protect claims was unclear in some important respects. Under the doctrine of qualified immunity, "although public officials may be 'charged with knowledge of constitutional developments, [they] are not required to predict the future course of constitutional law.' 'A reasonable government official cannot necessarily be expected to recognize the significance of a few scattered cases from disparate areas of the law....'" *Swanson v. Powers,* 937 F.2d 965, 968 (4th Cir.1991) (internal citations omitted) (quoting *Lum v. Jensen,* 876 F.2d 1385, 1389 (9th Cir.1989), and *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985)), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992). In the 1987 decision of *Ruefly v. Landon,* 825 F.2d 792, 794 (4th Cir.1987), we required evidence of a "specific known risk of harm to" the individual plaintiff. "[T]he gist of the amended complaint [in that case] [was] that the defendants knew Scottie Lowe to be a dangerous and violent inmate, and that, despite this knowledge, the defendants failed to protect Ruefly and other inmates against Lowe's violent propensities." *Id.* In support of his claim, Ruefly cited numerous prior episodes of violence involving inmate Lowe.[1] Analyzing the sufficiency of Ruefly's allegations, we opined:

> Ruefly has not sufficiently alleged that the defendants acted in deliberate indifference to a specific known risk of harm in failing to protect him from the assault by Scottie Lowe. At most, the amended complaint alleges that the defendants generally knew Lowe to be a violent person. It is not alleged, however, that the defendants knew or had reason to know that Lowe posed a specific risk of harm to Ruefly.

*Id.* In 1991, the Sixth Circuit adopted a similar "specific risk" requirement in the case of *Marsh v. Arn,* 937 F.2d 1056, 1061–62 (6th Cir.1991).

Other aspects of the state of mind necessary to state a failure to protect claim were also uncertain at the time Price was assaulted. In *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), the Supreme Court had held that an inmate shot by a guard attempting to quell a riot must prove that the guard acted with "obduracy and wantonness." By the time of the assault against Price, this court had applied the *Whitley* standard to cases involving assaults by fellow inmates. *E.g., Ruefly,* 825 F.2d at 793 ("The relevant question is whether Ruefly has alleged that the defendants wantonly and obdurately failed to take precautions for his safety in deliberate indifference to a specific known risk of harm posed by [the other inmate]."). However, some other circuits had declined to apply the "obdurate and wanton" standard to all prison disciplinary cases. For example, the Fifth Circuit held in *Foulds v. Corley,* 833 F.2d 52, 54 (5th Cir.1987), that deliberate indifference was the appropriate standard where no "imminent danger" was involved, while the Seventh Circuit required that conduct be deliberate or criminally reckless in *Goka v. Bobbitt,* 862 F.2d 646, 650 (7th Cir.1988). Even if it was apparent that "deliberate indifference" would prevail as the appropriate benchmark, circuits adopting that approach disagreed as to the standard's content, in particular whether actual or constructive knowledge was required. *Compare, e.g., McGill v. Duckworth,* 944 F.2d 344, 348 (7th Cir.1991) (holding that "deliberate indifference" requires a "subjective standard of recklessness"), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) *with Young v. Quinlan,* 960 F.2d 351, 360–61 (3d Cir.1992) ("A prison official is deliberately indifferent when he knows or should have known of a sufficiently serious danger to an

---

1. As we characterized his claims,

   Ruefly alleged that the defendants knew that Lowe had engaged in fights with other prison inmates on at least two occasions prior to the assault on Ruefly, and that on one of these occasions, Lowe had made threatening remarks suggesting that he would kill the inmate with whom he had been fighting. Ruefly further alleged that the defendants were aware that Lowe had assaulted his wife on one occasion when she visited him in prison. Additionally, Ruefly alleged that immediately prior to the assault on him, Lowe was sent to a psychiatric facility for a period of three weeks, due in part to his assaultive and unstable behavior toward other inmates.

   *Ruefly,* 825 F.2d at 794.

inmate."). In fact, this ambiguity was the justification for the grant of *certiorari* in *Farmer*. —— U.S. at ——, 114 S.Ct. at 1976.

Applying the *Ruefly* standard to these facts, there is no evidence that Tadlock should have known that Austin and Warren posed a specific risk to Price. Neither had assaulted Price before, nor had Austin or Warren threatened Price specifically. *Cf. Ruefly*, 825 F.2d at 794 ("There is no allegation in the amended complaint that Lowe had ever assaulted or threatened Ruefly prior to the incident on which this suit is based."). Moreover, despite the fact that Tadlock was with Price moments before the assault, Price did not mention any possibility of personal violence or seek additional protection for himself at that time. At least implicitly, even Price recognizes that Austin and Warren did not impose on him a particular personal danger, since he relies on the language from *Farmer* stating that an individual inmate need not be threatened specifically and need only demonstrate a "pervasive risk of harm." Brief of Appellant at 12. While *Farmer* established that a risk of danger particular to the individual was not required, —— U.S. at ——, 114 S.Ct. at 1982, that was not clearly the law, at least in this circuit, at the time of the attack on Price. Paraphrasing our earlier language, "to hold [Tadlock] liable because [he] failed to accurately predict the outcome of the [*Farmer*] decision would work a miscarriage of justice." *Swanson*, 937 F.2d at 967.

### III.

Because Tadlock could not reasonably have known that his behavior violated Price's clearly established rights at the time he was assaulted, Tadlock is entitled to qualified immunity and is, thereby, shielded from liability under that defense. On that basis, we affirm the judgment of the district court granting summary judgment in favor of Tadlock.[2]

*AFFIRMED.*

---

2. In light of our qualified immunity ruling, we decline to address whether Tadlock's inaction might have constituted deliberate indifference to a substantial risk of serious harm under *Farmer* and its progeny.