**William STREET, Plaintiff–Appellant,**

v.

**CORRECTIONS CORPORATION OF AMERICA, Jimmy Turner, and Dexter Stephen, Defendants–Appellees.**

No. 95–5392.

United States Court of Appeals, Sixth Circuit.

Argued April 10, 1996.

Decided Dec. 17, 1996.

---

Richard H. Dinkins, Ronald W. McNutt, argued and briefed, Williams & Dinkins, Nashville, TN, Keith W. Veigas, Jr., briefed, Veigas & Cox, Birmingham, AL, for Plaintiff–Appellant.

James H. Drescher, argued and briefed, Stokes & Bartholomew, Nashville, TN, for Defendants–Appellees.

Before: SUHRHEINRICH and SILER, Circuit Judges; ALDRICH, District Judge.*

SILER, Circuit Judge.

Plaintiff William Street appeals the grant of summary judgment to the defendants, Corrections Corporation of America ("CCA"), Dexter Stephen, and Jimmy Turner, in this case brought under 42 U.S.C. § 1983 for violation of Eighth Amendment rights. For the reasons herein, we affirm the grant of summary judgment to CCA and Turner, reverse the district court's dismissal of claims against Dexter Stephen and remand for consideration of those claims.

## I.

Metro–Davidson County Detention Facility ("MDCDF") is run by CCA, a publicly held corporation, pursuant to a contract between CCA and the government of Nashville and Davidson County, Tennessee. The Davidson County Sheriff's department oversees the operation of MDCDF. Defendant Turner has been the warden at MDCDF since December 2, 1992.

In 1993, while serving a four-year sentence for aggravated burglary at MDCDF, Street argued with fellow "L Unit" inmate Wendell Harris; both Street and Harris yelled. Harris said, "You must not know who I am, I'll break you down." [1] Corrections Officer Don Parmele heard the argument, stopped it and reported it to Senior Correctional Officer ("SCO") Garner. Street later told Parmele that he would "whip" Harris.

The district court found that Street and Harris declined Garner's subsequent offer of protective custody. [2] Defendant Stephen later replaced Parmele at a shift change for the L Unit. Parmele told Stephen that Street and Harris had "gotten into it" and reported the incident to SCO Roderick Jones. Stephen was the only officer assigned to the unit to which Street, Harris and seventy-two other inmates were assigned. [3]

Stephen stated that after the shift change, Harris asked him either, "What would you do if I kicked [Street's] ass?" or "What would you do if I knock [Street] out?" [4] Stephen told Harris that if he witnessed such an

---

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Street testified that he had had no prior disputes with Harris, that this argument lasted three or four minutes, and that he and Harris were six or seven feet apart during this argument.

2. Street contends that he did not speak to Garner after the argument. Garner testified that he spoke to both Street and Harris after the argument and that they told him that the argument was over.

3. Turner and CCA contend that MDCDF has been in compliance with the staffing requirements of its contract and the standards of the American Corrections Association and that "[t]here has never been a formal policy at MDCDF requiring two officers in a medium housing unit for a certain number of inmates." Stephen complained about what he perceived to be understaffing and claimed that this incident could have been avoided had another officer been with him in L Unit. Turner and CCA contend that any officer at MDCDF can summon immediate assistance.

4. Before Harris said these things to Stephen at the beginning of Stephen's shift, Harris and another inmate had followed Street into another inmate's cell and closed the door behind them. Parmele instructed them to leave.

incident, it would be reported and that Harris would be placed in isolation. Stephen admitted that he failed to report this discussion with Harris to a senior officer or supervisor.

Stephen stated that he then simultaneously opened all the doors to the cells in L Unit from a control panel.[5] After Stephen opened the doors, Harris attacked Street with a sock with at least one metal lock in it. Stephen testified that he could not see into Street's cell but that a sensor indicated that Street's cell door had been reclosed. Stephen saw eight or nine inmates gathered around Street's cell. Then Stephen saw Harris coming from the second floor of L Unit (where Street's cell was located) wearing a ripped shirt. Other inmates summoned Stephen to Street's cell. Stephen discovered Street in his cell with a lacerated eye and other injuries. Street told Stephen that he had been attacked by Harris.

Stephen radioed SCO Jones and Shift Commander Fred Lawson.[6] Street, conscious and walking, was taken to MDCDF's medical treatment facility. A nurse employed by CCA examined Street, cleaned his eye, and referred him to an independent contractor, Dr. Laurie Lawrence, who examined and treated Street.[7] An x-ray ordered by Dr. Lawrence was taken three days later.[8] Dr. Lawrence decided that Street did not need prescription pain medication. Street testified that he originally told a corrections officer that he was "okay" but that his pain later increased.

For the next two days, Street remained in segregated, pre-hearing detention where he complained of pain. He received Tylenol or aspirin twice over the next two days. He was visited by nurses during this time for administration of his daily dosage of the antidepressant Doxepin. The x-ray indicated that Street had suffered an "orbital blowout" fracture which was corrected with surgery six days later.[9] Street stated that he was "shocked" to learn of the fracture. He was returned to MDCDF's infirmary until the treating hospital performed surgery on him on the date set by the hospital. Turner and CCA contend that Turner was not involved with Street's medical treatment.

Charges of fighting against Street arising from this incident were dismissed. Harris was disciplined and charged with criminal assault, but he was later released from custody without posting bond. His whereabouts are unknown and he was not served in this action. Stephen stated that he was fired because he failed to report Harris' statements prior to the attack.

The district court found that Street and Harris were classified as medium custody inmates. Harris had had discipline problems, some involving violence, but had been recommended for parole on the morning of this incident. Turner and CCA contend that "[a]lthough Harris had a poor disciplinary record, Warden Turner had no information, prior to [this] incident, that Harris posed a threat to Street." About one month prior to this incident, Harris had been placed in administrative segregation due to his refusal to obey a corrections officer in association with Harris' threat of violence to another inmate. After this period of segregation, Turner allowed Harris' placement back into the gener-

---

5. Stephen stated that he told Turner, "[I]f there was any wrongdoing on my part ... it was that I opened all the doors." A Unit Manager, Brian Gardner, investigated this incident at the request of Warden Turner. Gardner testified that inmates believe that Stephen kept Street's friends locked in their cells during this incident and that Stephen listened to the incident over an intercom in Street's cell. SCO Jones stated that, immediately after the attack, an inmate accused Stephen of facilitating the attack and that Stephen became angry and had to be restrained.

6. Gardner testified that inmates believe Stephen waited several minutes before calling Jones.

7. Prison records indicate that the incident occurred at 4:45 p.m. and that the nurse's examination began at 5:20 p.m.

8. No evidence supports Street's contention that the x-ray was ordered for the next morning. Nurse Dianne Crane stated that the x-ray was not performed immediately because Dr. Lawrence had not ordered it "stat."

9. The bone that supports the eye was replaced with artificial material.

al prison population.[10] Jones stated that Harris was "assaultive and aggressive." Records kept by CCA described Harris as a "severe facility security problem" and as "a threat to the safety of inmates." The district court found that Street had been cited for fighting on several occasions. While Street had not been involved in any other violent incidents at MDCDF, he had been involved in violent incidents at other prisons.

Street brought this action under 42 U.S.C. § 1983 alleging that CCA, Turner, and Stephen violated his Eighth Amendment right to be free from cruel and unusual punishment by not protecting him from Harris' attack and by not providing him with adequate medical care. Street also made negligence claims under Tennessee law and an assault claim against Harris. Street and defendants CCA and Turner moved for summary judgment. The district court denied Street's motion for summary judgment, but granted in part and denied in part the motion for summary judgment filed by CCA and Turner. It then dismissed Street's case, thereby dismissing Street's claims against Stephen *sua sponte*. Because Street's federal claims were dismissed, the state law claims were dismissed for the resulting lack of jurisdiction. Street has negligence claims pending against CCA, Turner, and Stephen in Tennessee court.

## II.

■ This court reviews an order granting summary judgment de novo. *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1019 (6th Cir.1995). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

## III.

■ A section 1983 claimant must show "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." [11] *Simescu v. Emmet County Dept. of Social Servs.,* 942 F.2d 372, 374 (6th Cir.1991) (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978)).

## A.

■ This court recognizes the "public function test" "for determining whether private conduct is fairly attributable to the state." *Ellison v. Garbarino,* 48 F.3d 192, 195 (6th Cir.1995). "The public function test 'requires that the private entity exercise powers which are traditionally exclusively reserved to the state.'" *Id.* (quoting *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992)). The defendants were "acting under color of state law" in that they were performing the "traditional state function" of operating a prison. *See Hicks v. Frey,* 992 F.2d 1450, 1458 (6th Cir.1993) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting 'under color of state law.'").

## B.

■ "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994) (citations omitted). Prison officials can be held liable for an Eighth Amendment violation when an inmate shows: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had "the state of mind ... of 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at ——, 114 S.

---

10. Street claims this placement, approved by Turner, was "without justification."

11. Section 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... sub-

jects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured in an action at law ... [or] suit in equity." 42 U.S.C. § 1983.

Ct. at 1977 (citations omitted). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at ——, 114 S.Ct. at 1978.

Prior to the Supreme Court's decision in *Farmer,* this court noted, "Failure to segregate violent inmates from non-violent inmates has been held to constitute 'deliberate indifference' and thus to violate the eighth amendment where there is a 'pervasive' risk of harm or where the victim belonged to an 'identifiable' group of prisoners 'for whom risk of assault is a serious problem of substantial dimension." *Marsh v. Arn,* 937 F.2d 1056, 1061 (6th Cir.1991) (citing *Walsh v. Mellas,* 837 F.2d 789, 793–94 (7th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); *Martin v. White,* 742 F.2d 469, 474–75 (8th Cir.1984)). In *Marsh,* this court also noted the Fourth Circuit's holding that the failure to segregate an inmate with violent propensities is negligence, not deliberate indifference to a risk of harm to the plaintiff inmate. 937 F.2d at 1062 (citing *Ruefly v. Landon,* 825 F.2d 792, 794 (4th Cir.1987)).

The Fourth Circuit recently described these cases in *Price v. Sasser,* 65 F.3d 342, 346 (4th Cir.1995). After discussing the standards articulated in *Ruefly,* the court noted that "the Sixth Circuit adopted a similar 'specific risk' requirement in … *Marsh." Price,* 65 F.3d at 346. This court did not, however, *require* a showing of "specific risk." In *Marsh,* this court reasoned that prison officials violate the Eighth Amendment when deliberately indifferent to *either* a pervasive risk of harm generally *or* a serious risk of assault to a member of an identifiable group. 937 F.2d at 1061. The Fourth Circuit also indicated that these are *alternative* methods of demonstrating an Eighth Amendment violation. *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

The Supreme Court held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1981; *see Price,* 65 F.3d at 347 ("*Farmer* established that a risk of danger particular to the individual was not required…."). To the extent that *Marsh* required a showing of "specific risk," it is inconsistent with *Farmer.*[12] To the extent that *Marsh* allowed a plaintiff to prove an Eighth Amendment violation by means of showing a "pervasive risk of harm," it is consistent with *Farmer's* requirement of a showing of a "substantial risk of serious harm":

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, *pervasive,* well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer,* 511 U.S. at —— – ——, 114 S.Ct. at 1981–82 (emphasis added) (citation omitted).

A "subjective approach" must be used to determine whether the defendants had "the state of mind … of 'deliberate indifference' to inmate health or safety." *Id.* at ——, 114 S.Ct. at 1977.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at ——, 114 S.Ct. at 1979. This is a question of fact "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

---

12. An Eighth Amendment plaintiff might demonstrate that he was subject to a substantial risk of serious harm because he was subject to a specific risk of harm. That plaintiff cannot be *required* to show that he was subject to a specific risk of harm, however.

obvious." *Id.* A prison official can be liable if he "disregards that risk by failing to take reasonable measures to abate it." *Id.* at ——, 114 S.Ct. at 1984.

### C.

There are issues of fact as to whether an MDCDF official was deliberately indifferent to a substantial risk of serious harm to Street by "failing to take reasonable measures to abate it." *Id.* There is an issue of fact as to whether this risk became so "obvious" to be "substantial" after Harris asked the guard on duty (defendant Stephen) either, "What would you do if I kicked [Street's] ass?" or "What would you do if I knock [Street] out?" [13]

### IV.

The question Harris asked Stephen demonstrates that there are issues of fact as to whether Stephen was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and whether he actually "dr[e]w the inference." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1979. If, as it appears, Stephen was aware of these facts and actually drew such an inference, he would be liable to Street under § 1983. These issues of fact are therefore material.

### A.

Parmele, the guard Stephen replaced in the L Unit, told Stephen of the argument between Street and Harris. There are genuine issues of fact as to what Harris meant by his hypothetical question to Stephen. Stephen testified that he did not feel that the question indicated a "threat to Street's safe-

ty." Stephen stated in an affidavit, "While I recognize that I was reckless with regard to the danger to Mr. Street by not keeping Mr. Harris away from him, I did not intentionally strive to harm him."

Stephen was served with process but filed no answer. Street's motion for summary judgment against Stephen (and the other defendants) was denied and the entire case was dismissed pursuant to the district court's granting the motion for summary judgment filed by Turner and CCA. Turner and CCA contend that the *sua sponte* dismissal of Street's claims was proper because "Street's conduct clearly indicates an intent to waive his § 1983 claims against Stephen." They contend that this waiver is apparent from Street's failure to include Stephen in his motion for partial summary judgment and failure to move for a default judgment against Stephen. They contend that "Street's motion [for partial summary judgment] *excluded* Dexter Stephen."

■■■ Street's motion for partial summary judgment was not limited to CCA and Turner; it states, "Street moves for summary judgment on the issue of liability." In his memorandum in support of that motion, Street argues specifically that Stephen violated his Eighth Amendment rights. CCA and Turner do not cite any authority for the proposition that failure to move for summary judgment or a default judgment amounts to a waiver. There appears to be no authority for that position. They contend, in the alternative, "that there is no evidence to support any constitutional claim against Stephen." The district court's *sua sponte* grant of summary judgment to defendant Stephen was not proper because, taking the evidence in

---

**13.** After Street's injuries were inflicted, he was not "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1977. He was provided medical treatment soon after his injuries were inflicted. An x-ray was provided. Surgery was scheduled and performed six days later in accordance with the instructions of the hospital and treating physician. The physician that treated Street testified as to the adequacy of Street's care. Street offers only his own conclusory statements to the contrary. "[I]nadequate prison medical care violate[s] the Cruel and Unusual Punishments Clause [only when it amounts to]

'deliberate indifference to serious medical needs of prisoners'". *Id.* at ——, 114 S.Ct. at 1978 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). Street's medical needs were met. While there is evidence that Street had requested more medical care (i.e., pain medication prior to his hospital visit), "there is no evidence that [the defendants] either w[ere] aware of or had any responsibility for this lack of medical attention." *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir.1995) (holding failure to check medical records of inmate that eventually died to be mere negligence).

the light most favorable to Street, there are genuine issues of material fact as to whether Stephen was deliberately indifferent to a substantial risk of harm to Street.

### B.

As there is no evidence that Turner was aware of Harris' questions to Stephen, Turner could not have been deliberately indifferent to the risk created by those questions. There is evidence that Turner was aware of the past violent incidents involving Harris. If Turner could be found liable, his liability would necessarily be based solely on the fact that Harris was incarcerated in the same unit of MDCDF with Street.

■ Incarcerating Harris in the same "unit" of the prison with Street (i.e., failing to "segregate" Harris) was not " 'deliberate indifference' to a substantial risk of harm" to Street.[14] *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1974. Harris had a history of violence while incarcerated. Street had also been involved in incidents involving violence while incarcerated. Turner was aware that, on the morning of this incident, a parole board had recommended that Harris be paroled. In *Marsh* this court found that there was insufficient evidence to state an Eighth Amendment claim where that claim was based solely on the incarceration of an inmate that had been involved in two prior fights in the prison in the same unit as the plaintiff. 937 F.2d at 1056–59. The attacker in that case had never before "unilaterally provoked and attacked, another inmate." *Id.* In *Ruefly*, the Fourth Circuit held that it was "at most, . . . negligence" to incarcerate an inmate with a record of violent incidents (similar to Harris') with the plaintiff. 825 F.2d at 794. To the extent those cases required a showing of a "specific risk" to the plaintiff, they have been overruled by *Farmer* and are no longer reliable. Since the Supreme Court's decision in *Farmer*, the Eleventh Circuit has held that there were

genuine issues of material fact as to the Eighth Amendment liability of a sheriff responsible for a jail where "inmate-on-inmate violence occurred regularly when the jail was overcrowded, as it was [when the incident in question occurred.]" *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir.1995).

■ There is no evidence that MDCDF was overcrowded. Even if MDCDF was understaffed, as Stephen claimed, and Turner was aware of such understaffing, as Street claims, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at ——— ———, 114 S.Ct. at 1982–83. There is ample evidence of the reasonableness of Turner's actions in regard to staffing at MDCDF: staffing levels were maintained consistent with the requirements of the Tennessee Corrections Institute and the American Corrections Association. Neither the faulty phone system, allegedly responsible for Street's original argument with Harris, nor that argument itself, created a substantial risk of serious harm to Street.[15] Even taking the facts and the inferences drawn from those facts in the light most favorable to Street, there are no genuine issues of fact as to whether Turner was deliberately indifferent to a substantial risk of serious harm to Stephen.

### C.

■ There are genuine issues of fact only as to whether *Stephen* violated Street's Eighth Amendment rights. There was no evidence presented that indicated that Stephen's deliberate indifference to the risk of harm to Street (i.e., his failure to take action in light of Harris' questions) was undertaken pursuant to any policy or custom of CCA or because of the inadequacy of Stephen's training. Therefore, CCA's only potential liability

---

14. In *Farmer*, the Court noted, "At what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes is a question this case does not present, and we do not address it." 511 U.S. at —— n. 3, 114 S.Ct. at 1977 n. 3.

15. The original argument between Street and Harris was not serious and did not create a substantial risk of serious harm.

is vicarious liability for the actions of Stephen.

A defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis. *Monell v. Department of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 ... (1978). *Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well. *See Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir.1989) (private mental health center); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir.1982) (department store); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir.1982) (security guard employer); *see also Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir.1988) (en banc); *vacated on other grounds,* 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 ... (1989) (private defendants in 42 U.S.C. § 1983 actions should have at minimum same defenses available to public defendants).

*Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir.1992). "[C]onsiderable conceptual difficulty would attend any search for the subjective state of mind of a government entity, as distinct from that of a government official." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1981. Summary judgment was properly granted to CCA.

## V.

 Street claims that CCA, Turner and Stephen are liable to him for the failure to exercise ordinary care under Tennessee law and that CCA is liable for the negligence of its agents and employees under Tennessee law.[16] The district court had supplemental jurisdiction over Street's state law claims. 28 U.S.C. § 1367. "District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed...." *Noble v. White*, 996 F.2d 797, 799 (5th Cir.1993). As supplemental jurisdiction over Street's state law claims was lacking after dismissal of the federal claims, the

district court did not abuse its discretion in dismissing Street's state law claims. On remand for consideration of Street's claims against Stephen, the district court "should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues" in light of Street's pending case in Tennessee court based on substantially similar claims. *Landefeld v. Marion General Hosp.*, 994 F.2d 1178, 1182 (6th Cir.1993).

We REVERSE the district court's dismissal of claims against Dexter Stephen, AFFIRM the grant of summary judgment to CCA and Turner, and REMAND for consideration of Street's claims against Stephen.

---

**16.** Street also claims that Harris is liable to him for assault in violation of Tennessee law. Street's claims against Harris were properly dismissed because Harris was not served in this action. Fed.R.Civ.P. 4(c).