NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0196n.06
Filed: March 12, 2009

No. 06-3627

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MICHELLE ORTIZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| PAULA JORDAN AND REBECCA | ) | THE SOUTHERN DISTRICT OF |
| BRIGHT, | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

Before:  BOGGS, Chief Circuit Judge, DAUGHTREY and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**   Michelle Ortiz, a former inmate, brought a

§ 1983 claim against various prison officials alleging that, while incarcerated, she was sexually

assaulted by a prison guard on two successive nights and that prison officials failed to protect her

from the second assault.  She also claimed that prison officials retaliated against her for reporting

the incident.  The jury found in favor of the former inmate and against two prison officials, Paula

Jordan and Rebecca Bright.  The prison officials appealed.  For the reasons set forth below, we

conclude that both Jordan and Bright are entitled to qualified immunity.

I.

The evidence, as reflected by the jury's verdict and, therefore, viewed on appeal in the light

most favorable to Ortiz, established that at the time of the events at issue in this case, Michelle Ortiz,

a former inmate at the Ohio Reformatory for Women, was serving a one-year sentence for aggravated assault in the stabbing of her husband, apparently in retaliation for multiple incidents of domestic violence to which she had been subjected over a period of several years. While incarcerated, she was sexually assaulted by a corrections officer, Douglas Schultz, on two successive nights. Ortiz testified that the first assault occurred on Friday, November 8, 1996 in her living quarters at the JG Cottage. Schultz, who reportedly had a habit of being "overly friendly" and "touching people," walked up behind Ortiz while she was alone in the washroom and grabbed her shoulder. Ortiz said, "Oh, are you giving me a back rub?" and Schultz replied, "No, that's not what I was reaching for" and grabbed her breast. Upset, Ortiz told him to get away from her. After a brief verbal altercation, Schultz complied, but later that night he told Ortiz, "I'll get you tomorrow, watch."

The next day, Saturday, November 9, 1996, Ortiz approached another corrections officer, Steve Hall, and told him that Schultz had assaulted her the night before. Hall immediately took Ortiz to see the acting case manager for the JG Cottage, Paula Jordan. Hall testified that when he dropped Ortiz off at Jordan's office, he told Jordan what Ortiz had told him, including the name of the officer in question, but did not stay because his shift was about to end.

Despite the fact that Ortiz was crying and obviously upset, Jordan told her that it was Schultz's last day at the JG Cottage because of a previously planned reassignment to another correctional facility. Although Jordan said that "no one has the right to touch you," she also told Ortiz to "keep in mind that the man was leaving," that "this was his nature," and that he "is just an old dirty man." Jordan encouraged Ortiz to "hang out with [her] friends" for the rest of the day so that Schultz would not have the chance to be alone with her. Ortiz explained at trial that upon

2

learning from Jordan that it was Schultz's last day, she decided not to file a complaint but instead just to "let it go" and get through Schultz's last day by following Jordan's suggestion that she use what amounted to a buddy system. Jordan also told Ortiz that "if anything happens" again, she could report it on Tuesday, when Jordan returned to work.[1]

The second assault occurred later on Saturday, the same day that Ortiz had spoken with Jordan. Ortiz testified that she was feeling ill, went to her room, and subsequently fell asleep. Although there were three other people in the room with Ortiz when she went to sleep, they were gone when she woke up and found Schultz standing over her, one hand fondling her breast and the other in her "crotch area" inside her underwear. When she realized what was occurring, Ortiz raised a ruckus, hitting and scratching Schultz until he left the room.

The written statement that Ortiz submitted regarding the second assault reported that Schultz "fluttered his fingers across my left breast [and] smoothed across my blanket on my crotch area." She later testified that Schultz had succeeded in "putting his fingers inside [her]," saying that it upset her to the point that she asked Jordan whether "[she] needed to put it in" the written statement and was told to refer simply to contact with "the crotch area."

The day after the second assault, Sunday, November 10, 1996, Ortiz told Officer Hall that Schultz had "touched [her] again," and Hall took her to the sergeant's office to report the incident. As a result, the matter was referred to institutional investigator Rebecca Bright, who received a call

---

[1]After her conversation with Ortiz, Jordan purportedly wrote up an incident report detailing her version of the conversation and put it in her work bag, intending to drop it off in a mailbox outside the warden's office, where such reports were normally placed. She later said that she had forgotten to put it in the mailbox before she left work, however. Therefore she did not turn it in until the following Tuesday, when she returned to work after a holiday weekend.

about the incident on Sunday but, because she was told that Schultz had just been transferred and was no longer assigned to the facility, did not actually begin an investigation until Monday. During the course of that investigation, Bright met with Ortiz and other relevant persons, including Officer Schultz, collected relevant documents, and scheduled a lie detector test for Ortiz, which Ortiz "passed."

Ortiz's claim against Jordan stemmed at least in part from Bright's conclusion that Jordan had violated the standards of employee conduct by failing to turn in the incident report promptly. Bright testified at trial that if Jordan had reported the first incident immediately, "the proper people would have taken a role in protecting Ms. Ortiz." As for Officer Schultz, although he initially denied any wrongdoing, he voluntarily resigned his position. Bright explained that this event effectively ended her investigation because her administrative role was limited to investigating employee misconduct.

Ortiz's claim against Bright emanated from Bright's recommendation early in her investigation that Ortiz be placed in "security control." As a result, on the Tuesday after the assault, Ortiz was transferred to the "ARN Unit," otherwise referred to by the inmates as "the hole," where she was put into solitary confinement. Bright later testified that she had warned Ortiz several times not to speak about the investigation with other inmates, indicating in her final warning to Ortiz that this was a "direct order." When she received reports that Ortiz was still discussing the investigation with other inmates, Bright recommended to the warden that Ortiz be placed in "security control," and the warden approved the action. Bright explained that this gag order was intended both to protect the integrity of the investigation and to protect Ortiz from possible altercations with other

4

prisoners who were loyal to Schultz. But Bright also attributed her action to compliance with Ohio Administrative Code § 5120-9-11, a provision that provides for the placement of an inmate in isolation prior to a hearing for investigation if there is a threat of disruption to the institution. Ortiz was taken in handcuffs and shackled to a location that she described as lacking adequate bedding, heating, and clothing.

Ortiz alleges that Bright's motive for placing her in "the hole" was purely punitive rather than protective, recalling that Bright told her that she was being put into the hole "because [she] had lied." Ortiz also testified that after a day in solitary confinement, Bright called her back into her office, asked her to change her statement, and said, "[A]re you ready to tell me the story again?" When Ortiz responded she had already told her the story, Bright said, "[A]re you ready to tell me the truth?" Ortiz replied that she had already told the truth and began crying. Bright's reaction was to tell Ortiz, "[I]f you are going to cry, I am going to have to take you back to the hole right now." Within two days of this confrontation, a psychologist at the facility called Bright, told her that Ortiz was "not really handling the ARN complex very well," and was ill and vomiting. Ortiz was moved to the infirmary that day, on the recommendation of the psychologist, and she remained there for a week before being transferred back to her regular room in the JG Cottage.

Ortiz filed this § 1983 action against Jordan, Bright, Schultz, Warden Shirley Rogers, and Ohio Governor George Voinovich, alleging, among other claims, an Eighth Amendment violation by Jordan for failing to protect Ortiz and a due process claim violation by Bright for placing her in solitary confinement. When Schultz could not be served with process, he was dismissed from this action. The remaining four defendants filed a motion for summary judgment denying liability and

claiming qualified immunity. Ortiz filed a brief in opposition to the motion, in which she requested that "the defendants' Motion for Summary Judgment be denied as it pertains to defendant Paula Jordan" but did not mention the other three defendants. The district court denied summary judgment on the Eighth Amendment claim against Jordan and the due process claims against Bright and Warden Rogers, but dismissed all other claims. The district court also denied qualified immunity to the remaining defendants, but the defendants did not file an interlocutory appeal of the denial of qualified immunity.

Before the case reached trial, Warden Rogers died, leaving only two defendants, Jordan and Bright. The jury awarded Ortiz $250,000 in compensatory damages and $100,000 in punitive damages against Jordan and $25,000 in compensatory damages and $250,000 in punitive damages against Bright. The district court entered judgment in Ortiz's favor based on those verdicts. Jordan and Bright now appeal the verdict and the award of damages in Ortiz's favor. Both contend that they are entitled to qualified immunity.

II.

A.

Although courts normally do not review the denial of a summary judgment motion after a trial on the merits, denial of summary judgment based on qualified immunity is an exception to this rule and, just as in interlocutory appeals of qualified immunity, the standard of review is *de novo*. *See Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999); *see also McIntosh v. Weinberger*, 810 F.2d 1411, 1431 n.7 (8th Cir. 1987), *vacated on other grounds*, 487 U.S. 1212 (1988). To determine whether an officer is entitled to qualified immunity, we must first determine as a threshold matter

6

whether, considering the facts in the light most favorable to the plaintiff, a constitutional right was violated and, if so, whether that right was clearly established at the time of the violation. *See Causey v. City of Bay City*, 442 F.3d 524, 528 (6th Cir. 2006).

i.

"[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

Jordan contends that she did not violate Ortiz's Eighth Amendment rights because she was not "deliberately indifferent" to the substantial danger that Schultz posed to Ortiz. *See id.* at 828. She cites, for example, her advice to Ortiz to use the buddy system as evidence that although she may have been negligent, she was not "deliberately indifferent." In support of this position, Jordan relies on *Marsh v. Arn*, 937 F.2d 1056, 1068-69 (6th Cir. 1991), *overruled on other grounds by Farmer*, 511 U.S. at 825, *as recognized by Street v. Corrections Corp. of Am.*, 102 F.3d 810, 815 (6th Cir. 1996), a case in which we upheld the grant of qualified immunity to a prison official who took some steps to protect an inmate from threats by another inmate, even though the prison official did not believe the threat was serious.

Here, viewing the facts in the light most favorable to Ortiz, Ortiz reported the first encounter with Schultz to Jordan on the afternoon of Saturday, November 9, 1996, the day after it occurred. Jordan was made aware of Schultz's identity. There is no evidence that Jordan knew that Schultz had said that he would "get [Ortiz] tomorrow." Jordan told Ortiz that nobody had a right to touch her and that Ortiz could report the incident. Jordan asked Ortiz what she wanted to do. Jordan also told Ortiz that the day on which Ortiz spoke to Jordan was Schultz's last day at the institution. She told Ortiz to keep this in mind and that Schultz was "just an old dirty man." Jordan suggested that Ortiz stay with her friends for the rest of the day so that Schultz would not have an opportunity to be alone with her. Jordan did not have the authority to reassign an officer, such as Schultz. Reassignment required approval of the warden and was typically initiated at the request of a captain. Because Ortiz elected not to make a voluntary statement, Jordan did not bring the matter to the captain's immediate attention. Instead, she wrote an "Incident Report" relating her version of the conversation. She forgot to place the report in the mailbox outside the warden's office when she left work on Saturday. Instead, she turned it in when she returned to work on Tuesday, the first business day after a holiday weekend.

Jordan's conduct does not rise to the level of deliberate indifference. *See Farmer*, 511 U.S. at 828. Jordan was aware that Schultz would be at the institution only a few more hours and suggested a course of conduct by which Ortiz could effectively protect herself during that limited time. Jordan advised Ortiz of her options. She also wrote an incident report. Given Ortiz's decision not to proceed to make a voluntary statement, Jordan did not immediately approach the captain about

a reassignment for Schultz. These steps were a reasonable approach to the risk at hand.[2] The fact that they were ineffective does not change our analysis. Jordan did not violate Ortiz's Eighth Amendment rights because she was not "deliberately indifferent" to the substantial danger that Schultz posed to Ortiz. Therefore, Jordan is entitled to qualified immunity.[3]

ii.

The Due Process Clause of the Fourteenth Amendment states that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. "The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process." *Grinter v. Knight*, 532 F.3d 657, 572 (6th Cir. 2008) (citation omitted).

The Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), dooms Ortiz's due process claim against Bright and ultimately entitles Bright to qualified immunity. In *Sandin*, the Court held that prison regulations affording prisoners certain procedures before punishment is imposed create a protected liberty interest only when the punishment in question "imposes atypical

---

[2]There is no evidence that reporting the incident to a captain on November 9 would have resulted in Schultz's removal on that very day – his last at the institution. It seems much more likely that no action would have been taken until after an opportunity to investigate the allegation. Ortiz's failure to make a voluntary statement would have made a prompt investigation even more difficult. Furthermore, there is no evidence that placing the incident report in the mailbox on November 9 would have resulted in action against Schultz that day. In fact, the evidence is that the report would not have been reviewed until Tuesday, the day it was actually submitted. Jordan's presumed familiarity with prison procedures for investigating such incidents and reviewing incident reports highlights the lack of evidence of deliberate indifference.

[3]As there was no constitutional violation, we do not reach whether the right was clearly established in November 1996.

and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court went on to hold that "discipline in segregated confinement did not present the atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486. Similarly, Bright's act of transferring Ortiz to the ARN Unit did not constitute a violation of Ortiz's due process rights because a temporary placement in solitary confinement is not an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.[4]

Ortiz is correct in pointing out that *Sandin* does not sanction the use of solitary confinement for retaliatory purposes. The *Sandin* court itself noted that "[p]risoners ... of course, retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and Equal Protection Clause of the Fourteenth Amendment where appropriate." *Id.* at 487 n.11; *see also Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000) (*Sandin* does not stand for the principle that no claim arising out of administrative segregation can form the basis for a constitutional violation). Ortiz, however, did not stake her claim on any of these available provisions. Although Ortiz alleged in her complaint that Bright placed her in isolation "with a distinctly punitive purpose," arguably invoking a retaliation theory of the case, it is evident from the language in her complaint, as well as from the record as a whole, that her claim was conceived of and analyzed squarely as a due process violation and not as a First Amendment retaliation claim. We cannot reconstitute Ortiz's claim under a new theory at this stage of the

---

[4]As there was no constitutional violation, we do not reach whether the right was clearly established in November 1996.

proceedings.  Bright did not violate Ortiz's due process rights and is entitled to qualified immunity.[5]

B.

The principal appellate challenge to the damages award was mounted by Bright, contending with regard to the jury's verdict against her that the ten-to-one ratio of punitive damages to compensatory damages, when measured by the "guideposts" enunciated by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), was so "grossly excessive" as to violate due process.  That issue has become moot in light of our determination that Bright cannot be held liable in this case.  Similarly, Jordan's arguments regarding damages and her challenges to the district court's evidentiary rulings are moot.

III.

For the reasons set out above, we reverse the denial of qualified immunity to both Bright and Jordan and remand for further proceedings consistent with this opinion.

---

[5]Bright also argued that she was entitled to summary judgment because Ortiz did not oppose her motion.  Given our ruling on qualified immunity, we need not address this issue.

*Ortiz v. Jordan*, 06-3627

**Martha Craig Daughtrey,** Circuit Judge, dissenting.


A review of the annual report of dispositions by this court would reveal that each year we process several hundred section 1983 actions brought by state and federal prison inmates scattered throughout the Sixth Circuit. I would venture to guess that at least 90 percent – and probably even closer to 100 percent – of those cases come to us by way of summary judgment granted by the district court and are affirmed on appeal, virtually out of hand. Almost none of the cases that we review involves a jury verdict, let alone a jury verdict in favor of a plaintiff, because respondents routinely and successfully invoke the doctrine of qualified immunity. Indeed, when a district judge does find a material dispute of fact that prevents a grant of summary judgment and sends a section 1983 claim to trial, the plaintiff, being an inmate, is unlikely to arouse the sympathy of a jury of 12 law-abiding, "free-world" peers. This, then, is the exceedingly rare instance in which an inmate's claims not only survived the prison officials' defense of qualified immunity but, after a jury trial, also resulted in a significant monetary award of damages in the prisoner's favor. Nevertheless, the majority in this appeal has managed to extinguish that award by overturning the jury verdict and finding, contrary to the decision of the district court, that the respondents are entitled to qualified immunity. In view of the uncontested facts before the district court and the jury, I view this result as a legal travesty, and I therefore dissent.

There is arguably room for disagreement about the liability of Rebecca Bright. The majority emphasizes what it sees as a flawed pleading that, in its judgment, prevents the plaintiff's reliance on a retaliation theory of recovery. But the majority concedes that she alleges in her complaint that

*Ortiz v. Jordan*, 06-3627

Bright placed her in isolation "with a distinctly punitive purpose." Hence, the majority's basis for rejecting the retaliation claim seems hyper-technical at the very least. Equally unpersuasive is the majority's endorsement of Bright's invocation of Ohio Administrative Code § 5120-9-11, governing "security control and disciplinary control," as justification for Ortiz's transfer to isolation, an action that clearly affected her adversely. Even a superficial reading of that administrative code section reveals that the authority to isolate an inmate pending investigation of a rule violation applies to *the rule violator*, not the victim of the violation, to *the inmate threatening disruption*, not the inmate who has suffered from disruption during his or her incarceration. We have in the record a prison psychologist's report that Ortiz was "not handling [isolation in] the ARN complex very well" and was ill and vomiting, as well as prison records showing that she spent the following week in the prison infirmary recovering from the ill-effects of Bright's order relegating Ortiz to "the hole," purportedly for discussing the assaults that she had endured with other inmates. Viewing this evidence in the light most favorable to Ortiz, it seems evident that Bright's action could reasonably be found by a jury to constitute illegal retaliation.

But if there is any room for disagreement about Bright's liability in this case, there is none at all concerning Jordan's liability, because it was her deliberate indifference to a known risk to Ortiz that made the second assault by Douglas Schultz possible, if not inevitable. Ironically, the majority opinion that robs Ortiz of her victory before the jury also proves her case by setting out as fact the following:

▸ Ortiz reported the initial incident to Officer Hall on Saturday morning, presumably including

13

Schultz's threat to "get [her] tomorrow" as she fended him off on Friday night.

▸ Hall took the complaint seriously, escorting Ortiz to Jordan's office and repeating to Jordan what Ortiz had told him before he left, including the name of the officer in question.

▸ Rather than report the incident immediately, as prison policy required, or take security measures to prevent another assault, as reason would dictate, Jordan merely reminded Ortiz that Saturday was Schultz's last day at the prison and told her to "keep in mind that the man was leaving."

▸ At the same time, Jordan noted that Schultz "[wa]s just a dirty old man" and that his assaultive behavior toward her the night before "was his nature."

▸ Despite Schultz's threat to "get" Ortiz on Saturday, Jordan failed to arrange protection against a second assault and instead, in the words of the majority, "encouraged Ortiz to 'hang out with [her] friends' for the rest of the day so that Schultz would not have the chance to be alone with her," advice that Ortiz followed, to her detriment.

▸ Jordan also convinced Ortiz not to file a formal complaint because it was Schultz's last day before his transfer to another prison facility, telling Ortiz, again in the words of the majority, "that 'if anything happen[ed]' again, she could report it on Tuesday, when Jordan came back to work."

▸ As summarized by the majority, "[a]fter her conversation with Ortiz, Jordan purportedly wrote up an incident report detailing her version of the conversation and put it in her work bag" and "[forgot] to drop it off in a mailbox outside the warden's office, where such reports were normally placed,"

instead "turn[ing] it in . . . the following Tuesday, when she returned to work after a holiday weekend."

Significantly, rather than intervene in some reasonable way on Saturday, Jordan reported the situation to no one, instead leaving Ortiz with instructions to rely on a makeshift "buddy system" for protection from Schultz – one that proved to be sadly inadequate, as it turned out. Equally significant was Bright's testimony at trial that "if Jordan had reported the first incident immediately, 'the proper people would have taken a role in protecting Mrs. Ortiz'." But, leaving an inmate such as Ortiz wholly unprotected in the face of a known risk of an assault has repeatedly been held by this court and others to amount to deliberate indifference sufficient to establish liability under section 1983. *See, e.g., Scicluna v. Wells*, 345 F.3d 441, 445-46 (6th Cir. 2003) (holding that qualified immunity did not protect defendant guard where plaintiff was "a member of an identifiable group of prisoners for whom risk of assault was a serious problem"); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 815 (6th Cir. 1996) (observing that defendant guard's failure to act based on attacker's threatening statements could constitute deliberate indifference); *Giroux v. Somerset County*, 178 F.3d 28, 34 (1st Cir. 1999) ("When a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for a prisoner's safety."); *Walsh v. Mellas*, 837 F.2d 789, 797 (7th Cir. 1988) (finding that "failure to respond to the known danger of assault upon a member of an identifiable group of prisoners that are targeted by gangs . . . reaches the Eighth Amendment standard of liability–deliberate indifference to a known hazard").

*Ortiz v. Jordan*, 06-3627

The jury credited Ortiz's testimony, as well as that presented in her behalf, and we are charged to review the record in the light most favorable to her. *See Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001) ("We do not weigh the evidence, evaluate the credibility of witnesses or substitute our own judgment for that of the jury."). Although the majority's opinion sets out facts that obviously support the plaintiff's claims, those facts appear to carry no weight or substance with the majority. Moreover, the majority pays no discernible deference to the fact that the judgment in this case rests on a jury verdict. *See Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (noting that jury verdicts are due substantial deference). Given the legal posture of this case and the strength of the evidence against defendants Bright and Jordan, the majority's decision to overturn the jury's verdict strikes me not just as an unfortunate result in this case, but as one that is thoroughly senseless. I therefore dissent.