Jacob Randall **MILLER**, Plaintiff,

v.

**SHELBY COUNTY, TENNESSEE**, Robert Sprecher, individually and in his official capacity as Director of Shelby County Division of Corrections, and Jim Rout, individually and in his official capacity as Mayor of Shelby County, Defendants.

No. 98–2383 ML/V.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 29, 2000.

Robert L. Hutton, Glankler Brown, PLLC, Memphis, TN, for Plaintiff.

Brian L. Kuhn, Ford & Harrison, Memphis, TN, M. Dell Stiner, Wharton & Wharton, Memphis, TN, for Defendants.

## ORDER AND MEMORANDUM OPINION

McCALLA, District Judge.

### I. Background

Plaintiff Jacob Randall Miller brought suit under 42 U.S.C. § 1983 to recover damages for physical injuries suffered after he was attacked by fellow inmates while incarcerated at the Shelby County Correctional Center ("SCCC"). Shelby County is the only remaining Defendant in this case. Plaintiff alleges that Defendant's policies caused this harm and constituted deliberate indifference to inmate safety in violation of the Eighth Amendment to the U.S. Constitution.

For the reasons stated below the Court finds for the Plaintiff and ORDERS that Defendant pay Plaintiff Jacob Randall Miller damages in the amount of $40,000.[1]

---

1. Plaintiff filed several motions urging the Court to hold Defendant in contempt and impose sanctions for alleged discovery violations. In these motions, Plaintiff asked the Court for a finding of liability against the Defendant and for attorney's fees. Because

## II. Findings of Fact

The Shelby County Correctional Center ("SCCC") is located in Shelby County, Tennessee. SCCC is controlled and operated by Shelby County, a political subdivision of the State of Tennessee. Mr. Robert Sprecher was the Director of SCCC at all times relevant to this case. In this position, he was responsible for establishing policies and procedures with respect to classification of inmates, supervision of inmates, and inmate safety. The Criminal Justice Center ("CJC") is also located in Shelby County, Tennessee. The majority of inmates at SCCC have been sentenced and have begun serving their sentences while most CJC inmates at SCCC are pretrial detainees awaiting trial. For purposes of this litigation, the term "CJC inmates" refers to pretrial detainees housed at SCCC.

Shortly after arrival, SCCC classifies most inmates in accordance with a numeric system reflecting the inmate's security level, taking into consideration various factors such as the crime for which the inmate has been sentenced, future institutional adjustment, and disciplinary concerns. Gang affiliation is not necessarily considered when classifying an inmate. Inmates are given a number, 1 through 8, with 1's, 2's, and 3's considered low security, 4's, 5's, and 6's considered as medium security, and 7's and 8's maximum security. While incarcerated, an inmate's security level is re-evaluated and changed when necessary to reflect the inmate's behavior and adaption to the institution.

In addition to the general population housed at SCCC, certain inmates are placed in protective custody or administrative segregation. Those inmates with disciplinary problems are separated from the general population and confined to administrative segregation based on a determination by SCCC officials. E Building D Dorm houses protective custody inmates, administrative segregation inmates as well as pretrial detainees.

A protective custody inmate is one who requests to be housed away from the general population because he is fearful of physical harm from other inmates. Protective custody inmates do not receive good time credit towards their sentences like those inmates who remain in the general population. Thus, being in protective custody actually lengthens time served. While in protective custody, an inmate remains in his cell for 23 hours each day. The inmate is permitted to leave his cell and be on the "rock" for one hour a day. The "rock" is the common area in the immediate vicinity of an inmate's cell, and includes the shower, telephone, and exercise facilities. During "rock time", the prisoner may be on the rock. Certain inmates are selected by SCCC officials to serve as "rock man", which means that the inmate may be outside his cell cleaning the rock, serving meals, or assisting SCCC officials with other activities in E Building D Dorm.

At trial, there was conflicting testimony as to whether SCCC practice prior to October 11, 1997 was to permit inmates of different classification to take rock time together. Mr. Sprecher testified that the official policy of SCCC was to allow up to four inmates to rock together at the same time, regardless of their classification. Officer Moten also testified that this was SCCC policy. Charles Fisher, the Assistant Director of the Tennessee Corrections Institute, also stated that the policy prior to October 11, 1997 was that an inmate of any classification could rock with any other inmate. Prior to October 11, 1997, it was the practice at SCCC that (1) inmates with different security classifications would often rock together; (2) CJC inmates would be on the rock at the same time as protective custody inmates; (3) rock men could be on the rock while other inmates were

this Order holds Defendant liable and because attorney's fees are recoverable under § 1983, Plaintiff's motions are moot and this Order resolves all pending motions in the case.

taking their rock time; (4) four inmates could be on the rock at the same time.[2]

On December 20, 1995, Plaintiff Jacob Randall Miller arrived at SCCC to begin serving a sentence for aggravated burglary. Based on threats and other comments from fellow gang-member inmates, Miller feared that he would suffer physical harm. He therefore requested that he be placed in protective custody. Miller conveyed this desire by filling out several protective custody requests in which he explicitly stated that he feared gang reprisals based on his "naming" gang members. Some of the protective custody requests stated that he had been threatened by gangs. On several occasions, Miller made the protective custody request and then declined protective custody after a hearing was held on his request. He was eventually placed in E Building D Dorm.

In the summer of 1996, Thomas Cummings, Rory Haywood, and Vericho Jackson were arrested and charged with the murder of Shelby County Deputy Jailer Dedrick Taylor. In May, pursuant to an order of Judge Axley, Haywood, Jackson, and Cummings arrived at SCCC as pretrial detainees. This gang-related killing resulted in substantial media coverage and many SCCC officials at the facility knew that Cummings, Haywood, and Johnson were members of the Traveling Vice Lords ("TVL") gang charged with the murder of Deputy Jailer Taylor. Neither Cummings, Haywood, nor Jackson were classified because they were pretrial detainees. It was the practice at SCCC not to classify pretrial detainees. Haywood, Cummings, and Jackson were housed in E Building D Dorm.

Gang violence is not uncommon at SCCC. Nor is it uncommon for gang members to attack non-gang members in E Building D Dorm. In August 1996, the first of several disciplinary reports was filed against inmate Thomas Cummings. In September 1996, after another Code Blue involving Cummings, a report was filed noting that inmate Cummings had threatened to kill a fellow inmate and charging Cummings with several violations. Again, in May, 1997, a disciplinary report was filed detailing the disciplinary problems of inmate Cummings and noting that Cummings had threatened to kill a fellow inmate. Based on these reports, SCCC officials knew or should have known that Thomas Cummings was a potential threat to other inmates. The same is true of Haywood. On several occasions, Haywood was cited for fighting with other inmates and threatening to kill other inmates. For example, Haywood was cited for striking other inmates with cans of shaving cream in a sock. The disciplinary reports of Cummings and Haywood show not only that these two individuals had attacked and threatened other inmates, but that SCCC officials were aware of this information. Finally, Mr. Miller's mother Reva Faye Wyatt, testified that she repeatedly called several SCCC officials to inform them that Mr. Miller was having problems with gang members. While Mr. Sprecher did not recall whether he spoke with Ms. Wyatt, at least some SCCC officials had conversations with Ms. Wyatt in which she expressed concern about gang violence and Mr. Miller.

On October 11, 1997, Cummings and Haywood attacked Miller while he was on the rock making a phone call. Miller was hit in the back of the head and knocked down. Officer Whitley witnessed the attack and called for a "Code Blue" indicating an inmate on inmate attack. At the time of the attack, Miller was wearing leg irons and Haywood and Cummings were not. After the attack, Miller was transported to the Regional Medical Center at Memphis where he was treated for injury to his right shoulder. As a result of the attack, Miller received a scalp puncture wound and was diagnosed with subluxation of the right shoulder.

---

**2.** The Conclusions of Law portion of this Order addresses the legal question of whether this practice constituted a policy or custom under § 1983.

Both sides offered testimony as to how it came to be that Haywood and Cummings were on the rock at the same time as Miller. The debate focused on whether Cummings and Haywood were permitted to be on the rock with Miller or whether they somehow escaped from their cells to be on the rock without permission from SCCC officials. Plaintiff offered proof that these men were frequently on the rock and that they did not escape from their cells. The Defendant argues that Cummings and Haywood were either able to jam the doors open by sticking something in the door or that the cell doors were not functioning properly at the time of the attack.

The Court finds that Cummings and Haywood had permission to be on the rock at the time of the attack and did not gain access to the rock by escaping from their cells by jamming their doors. There was ample testimony that these particular inmates were frequently on the rock for periods far in excess of the mandatory one hour per day. Furthermore, Defendant offered no credible proof that they broke out of their cells by jamming the doors. Defendants attempted to prove this point by introducing into evidence log books showing inmate rock time at the time of the attack. Specifically, entries for October 11, 1997 show that Haywood and Cummings began their rock time at 6:55 p.m. and returned to their respective cells at 7:11 p.m. The entry for Miller indicates that he was on rock time from 5:55 p.m. until 6:55 p.m. Thus, according to the log book for October 11, 1997, Haywood and Cummings were not on the rock at the same time as Miller. While such evidence might otherwise be probative of when the inmates rocked, several of the entries in these books were altered. Specifically, the

out times originally recorded for Cummings and Haywood appear to have been written over. This conclusion is based on the Court's analysis of the log books as well as testimony from Officer John Whitley who testified that the log book entries had been altered. Therefore, the Court cannot give serious weight to the times in the log book. Defendant also argued that the doors were broken. Again, there was no evidence that this was the case.

As a result of the attack, Miller suffered subluxation of the right shoulder and a scalp puncture wound. Miller now suffers a permanent six percent anatomical impairment of his right shoulder as a result of the attack. This diagnosis was again confirmed by Dr. Smith one year after the attack. The impairment potentially affects any activity in which Mr. Miller is required to use his right shoulder. Furthermore, Defendant offered no evidence to refute Miller's contention that he is unable to lift heavy objects, suffers headaches, and has blurred vision as a result of the attack.

### III. Conclusions of Law

Section 1983 does not create independent constitutional rights. Rather, § 1983 provides for a cause of action for the vindication of constitutional guarantees found elsewhere.[3] *See Braley v. City of Pontiac,* 906 F.2d 220, 223 (6th Cir.1990). To prevail under § 1983, a Plaintiff must show (1) the deprivation of a right secured by the Constitution or a federal statute and (2) that the deprivation of the right was caused by a person acting under color of state law.[4] *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Street v. Corrections Corp. of America,* 102 F.3d 810, 814 (6th Cir.1996). Miller attempts to satisfy the first prong of the prima facie case by

3. Section 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage...subjects, or causes to be subjected, any citizen of the United States...to the depravation of any rights...secured by the Constitution and laws, shall be liable to the party

injured in an action at law...." 42 U.S.C. § 1983.

4. The parties in this case have stipulated that Defendant was acting under color of state law.

proving that SCCC's practice of allowing four inmates on the rock at the same time regardless of their classification amounted to deliberate indifference in violation of the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution. The specific allegation is that SCCC failed to protect Miller when SCCC officials followed a policy pursuant to which CJC inmates who were known to be gang members were permitted on the rock at the same time as Miller, an inmate who had expressed fear of gang violence.

In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipal liability under § 1983 cannot be based solely on a respondeat superior theory. Rather, municipal liability exists only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Thus, Miller cannot sustain a § 1983 claim based solely on the fact that SCCC officials may have violated a constitutional or statutory right independent of an SCCC policy or custom. Similarly, Miller cannot argue that SCCC officials were negligent and impute this negligence to Shelby County based on a respondeat superior theory.

As stated above, both Mr. Sprecher and Mr. Fisher testified that SCCC policy prior to October 11, 1997 was to allow inmates to rock together regardless of classification. As policy maker for SCCC, Sprecher's testimony carries considerable weight towards proving the existence of SCCC policy. Although there was some debate as to whether there was an official policy of mixed rocking[5] or whether the

practice was merely a custom which rose to the level of a de facto policy, this distinction is immaterial. Municipal liability is possible under *Monell* either if an official policy was promulgated by county and SCCC policymakers under which inmates were rocked together regardless of classification or if a custom was so pervasive that it became the defacto policy. *See, e.g., City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In other words, Miller can establish municipal liability based on custom by proving that the de facto policy was to allow inmates to rock together.

Plaintiff has made this showing. The record and log books contain many examples of inmates of different classifications rocking together. There is ample proof of a pattern whereby CJC inmates, including the very same inmates who attacked Mr. Miller, rocked with protective custody inmates. To conclude, Plaintiff has met the first hurdle of proving municipal liability by showing that SCCC had either a policy or a custom under which inmates of diverse classifications rocked together.

The Court must next determine whether SCCC's policy of allowing four inmates on the rock at the same time, regardless of the classification of those inmates, amounts to deliberate indifference to inmate safety in violation of the Eighth Amendment. There is no question that prison officials have an affirmative duty to protect inmates from violence perpetrated by other prisoners. *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir.1998). Plaintiff is also correct that the Eighth Amendment is the proper avenue for his challenge. *See Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), *quoting Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d

---

5. The term "mixed rocking" in this Order refers to those situations in which protective custody inmates were on the rock with CJC inmates as well as those situations in which protective custody inmates of varying security levels (low, medium, maximum) were on the rock at the same time.

271 (1991) (describing " 'the protection [an inmate] is afforded against other inmates' as a 'conditio[n] of confinement' subject to the strictures of the Eighth Amendment.").

■ The Supreme Court clarified the test for deliberate indifference in *Farmer*. A deliberate indifference claim consists of both objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Wilson*, 501 U.S. at 298, 111 S.Ct. 2321. To establish that prison officials violated an inmate's Eighth Amendment right to be free from cruel and unusual punishment, an inmate must show: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had the "state of mind...of 'deliberate indifference' to inmate health or safety." *Street*, 102 F.3d at 814, *quoting Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

■ Under the objective prong of *Farmer*, Miller must show that SCCC rocking policies created a substantial risk of serious harm. Under the subjective prong, Miller must show that SCCC officials knew of and disregarded an excessive risk to his health or safety and that these officials were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that such officials drew an inference from the facts. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. In *Farmer*, the Supreme Court explicitly rejected an objective standard for deliberate indifference which would allow prison officials to be held liable if they should have known of a substantial risk to inmate safety but did not have actual knowledge of the risk. *Id.* "[T]he

failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation," cannot be the basis of a deliberate indifference claim. *Farmer*, 511 U.S. at 826, 114 S.Ct. 1970. Furthermore, the subjective prong necessarily requires that a claimant show that prison officials failed to act reasonably in light of the known risk. *See Farmer*, 511 U.S. at 845, 114 S.Ct. 1970 (noting that "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause"). Mere negligence (or even gross negligence) does not constitute deliberate indifference. *Luttrell v. Nickel*, 129 F.3d 933 (7th Cir.1997). At the same time, however, a prisoner is not required to show that officials had an intent to harm. *See Newman*, 122 F.3d 650, 653. Rather, deliberate indifference falls somewhere between these two poles. *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970.

■ Miller has satisfied the objective prong of *Farmer* by illustrating that he was incarcerated under conditions posing a substantial risk of serious harm.[6] Plaintiff has also clearly met the subjective prong by offering considerable evidence that SCCC officials were aware of a substantial risk of serious harm. SCCC officials knew that the presence of gangs posed a serious safety concern to inmates generally.[7] Indeed, the Court's findings are bolstered by the fact that SCCC policy often fails to take gang affiliation into consideration when classifying inmates. Several SCCC officials testified that gang violence on non-gang inmates was not uncommon in E Building D Dorm. Furthermore, the fact that SCCC officials placed Cummings and

---

6. Because the same factors relevant to the Court's analysis of the subjective component are also pertinent to the objective "substantial risk of serious harm" prong, the Court discusses these issues together. This is consistent with the approach of other courts. *See, e.g., Street*, 102 F.3d at 814–17.

7. The fact that Cummings, Haywood, and Jackson were awaiting trial on capital murder charges is not by itself sufficient to put SCCC officials on notice that these inmates posed a threat to other inmates. Rather, the Court considers the myriad of factors that alerted SCCC officials that these particular inmates could likely pose a serious threat to inmate safety.

Haywood in E Building D Dorm is indicative that SCCC officials knew that Cummings and Haywood posed a risk to inmate safety. *See Newman,* 122 F.3d at 651.

■ In addition to its general knowledge that rocking gang members with protective custody inmates posed a substantial risk to inmate safety, SCCC officials had specific knowledge that Cummings and Haywood were a threat to other inmates. Mr. Sprecher knew that Cummings, Haywood, and Jackson were gang members. He and others testified that they were violent and disruptive. Indeed, Sprecher thought that SCCC officers might be afraid of dealing with these inmates because they were accused of murdering a deputy jailer. The Court also heard testimony from an inmate that an SCCC guard had warned him not to get involved with the with TVLs, suggesting that the inmate should surrender his commissary to a TVL rather than risk reprisal from TVL members. The same inmate refused rock time because he was afraid of the TVL inmates.

The record is replete with evidence that Cummings and Haywood were disruptive, had violent tendencies, and received frequent disciplinary reports. Charles Fisher, an expert on corrections policies and procedures, stated clearly that Mr. Cummings' conduct prior to the attack on Miller was illustrative of his violent propensities. Sergeant Jones reached the same conclusion about Haywood. Indeed, Mr. Fisher testified about a recurring theme of violence by Mr. Haywood against other inmates. The Court agrees with Mr. Fisher that given the repeated incidents of violence involving Cummings and Haywood, SCCC officials were put on notice that Cummings and Haywood would pose a physical threat to other inmates. Indeed, this abundance of direct evidence of Haywood's and Cummings' disruptive propensities makes Miller's case stronger than it would have been were the only relevant evidence of notice vague allegations about possible assaults by inmates with no disciplinary record. *Cf. Newman,* 122 F.3d at 653 (noting a "complete absence of evidence" other than the assailant's prison classification that defendants were on notice).

■ Defendant's culpability is exacerbated by the fact that SCCC officials had specific knowledge that Miller might personally be a specific target of gang violence.[8] On numerous occasions, Mr. Miller requested protective custody for the sole reason that he feared he would be physically attacked by gang members.[9] This fear was based on threats Mr. Miller received from gang inmates. SCCC officials had little reason to doubt the sincerity of these protective custody requests. The nature of protective custody lends credibility to protective custody requests. When

---

**8.** This is not to suggest that Defendant could avoid liability by demonstrating a lack of specific knowledge. In its Proposed Findings of Fact and Conclusions of Law, Defendant notes that "Plaintiff never engaged in any altercation or received threats from the two inmates responsible for this attack." ¶ 24. Of course, Defendant cannot escape liability by proving SCC officials were unaware that Miller specifically was vulnerable to attack by these particular inmates. The Supreme Court expressly rejected this argument in *Farmer,* holding that "a prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer,* 511 U.S. at 843, 114 S.Ct. 1970. *See also,*

*Taylor v. Michigan Dept. of Corrections,* 69 F.3d 76, 81–2 (6th Cir.1995).

In *Street,* the Sixth Circuit clarified its previous holdings as consistent with *Farmer,* noting that "An Eighth Amendment plaintiff might demonstrate that he was subject to a substantial risk of serious harm because he was subject to a specific risk of harm. That plaintiff cannot be required to show that he was subject to a specific risk of harm, however." *Street,* 102 F.3d at 815, n. 12.

**9.** Though Miller's own warnings indicate that SCCC officials were on notice, warnings from the complaining inmate himself are not required when other evidence illustrates a substantial risk of serious harm. *Woods v. Lecureux,* 110 F.3d 1215, 1224 (6th Cir.1997).

an inmate enters protective custody, his sentence is essentially increased. Furthermore, the inmate is locked in his cell for 23 hours a day. Given these disadvantages of protective custody, it is unlikely that Mr. Miller would have requested protective custody unless he was truly fearful. The harsh realities of protective custody provide a built in mechanism for discouraging frivolous requests.

This is not a case in which Plaintiff bases a deliberate indifference claim on vague and conclusory statements that Defendant was aware of a dangerous condition or risk. See, e.g., Gibson v. Foltz, 963 F.2d 851 (6th Cir.1992). Nor is it a case where there is only one example of a defendant receiving notice of a substantial risk to inmate safety. See, e.g., Spruce v. Sargent, 149 F.3d 783, 786 (holding one document to be insufficient evidence that defendant had the subjective knowledge required under Farmer). Rather, Miller has demonstrated numerous specific facts, from a variety of sources, that put SCCC officials on notice that their rocking policies created a substantial risk to Plaintiff's safety.

Therefore, the previous conduct of Cummings and Haywood, Mr, Miller's repeated protective custody requests, and SCCC's general knowledge about gang violence in prison put SCCC officials on notice that allowing Cummings and Haywood to be on the rock with Miller created "a substantial risk of serious harm" to Miller.[10] A policy or custom permitting this risk rises to the level of deliberate indifference.

Miller has also proven that SCCC officials failed to take reasonable steps to avoid the known risk. As stated above, there is no liability under the Eighth Amendment if prison officials respond reasonably to a known risk. Farmer, 511 U.S. at 844, 114 S.Ct. 1970. Merely placing Haywood and Cummings in administrative segregation was insufficient to avert harm to other inmates. In Doe v. Welborn, 110 F.3d 520 (7th Cir.1997), prison officials placed an inmate who was a known "snitch" in protective custody after it became apparent to prison officials that the inmate was in danger. Prison officials also arranged for the inmate to be moved to another facility. The Seventh Circuit affirmed the district court's holding that there was no deliberate indifference because the warden's response to the known threat was reasonable. See Doe, 110 F.3d at 525. See also Farmer, 511 U.S. at 844, 114 S.Ct. 1970 (holding that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.)"[11] There was no such reasonable response in the instant case. Indeed, there was little evidence that SCCC took any affirmative steps to protect Miller. Cf. Jackson v. Everett, 140 F.3d 1149 (8th Cir.1998)(refusing to find deliberate indifference where prison security officer investigated inmate's allegations that his physical safety was in jeopardy). The only way to ensure Cummings and Haywood could not harm Miller would have been for SCCC officials to require that Cummings and Haywood take their rock time by themselves. The Court's finding of deliberate indifference is strengthened by the fact that SCCC officials had readily available alternatives that would have alleviated the danger to Miller. See Haley v. Gross, 86 F.3d 630, 639 (7th Cir.1996)(describing various steps the prison could have taken to minimize risk to

---

10. On several occasions, Miller requested protective custody and then withdrew his request at the protective custody hearing. This fact does not necessarily undermine the credibility of Miller's protective custody requests and Defendant failed to develop proof on this point.

11. In Doe, the basis of plaintiff's claim was psychological as opposed to physical injury. Though the Seventh Circuit suggested that psychological injury was insufficient to state a claim for deliberate indifference, the court also addressed the reasonableness of defendant's conduct.

complaining inmate). Had Defendant taken these steps, the Court could not find deliberate indifference even if the harm actually occurred. *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970. Giving Haywood and Cummings rock access at the same time Miller was also on the rock was far more than a negligent act. The decision essentially created the risk and exposed Miller to the danger that manifested itself in the attack. Allowing Haywood and Cummings on the rock is factually similar and legally identical to the guards opening the cell doors in *Street.* *See Street*, 102 F.3d at 813. Indeed, the instant case is quite similar to those prison cases in which the opening of the assailant's cell doors forms the basis of the deliberate indifference claim. *See, e.g., Newman*, 122 F.3d at 653. SCCC officials could have denied Haywood and Cummings the privilege of serving as rock men, thereby avoiding a situation in which they would have access to other inmates on the rock. Finally, even if SCCC officials decided to allow Cummings and Haywood on the rock with other inmates, it was unreasonable to allow them on the rock without leg irons while Miller was wearing leg irons. The Court is strained to find any evidence that SCCC officials took any action to alleviate the risk to Miller.

The Court recognizes that prison officials are not able to create an environment in which inmate on inmate attacks never occur. Indeed, the Supreme Court has recognized that prisons are violent places in which such conduct should be expected. *See, e.g., Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). However, this recognition of the dangerousness of prisons must be balanced against the prison's affirmative duty to protect inmates from violence perpetrated by other prisoners.

The final issue to be determined is whether the challenged policy proximately caused the damage to Mr. Miller. *See Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir.1993); *Doe v. Sullivan County*, 956 F.2d 545, 550 (6th Cir.1992); *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987). Defendant asserts that there is no causal connection between SCCC's policies and procedures and the injuries suffered by Miller.

The Court, however, finds that Plaintiff has proven causation in this case. SCCC's policy of allowing inmates to be on the rock at the same time regardless of security classification caused the damages to Mr. Miller. Phrased another way, the attack on Mr. Miller could have been prevented had SCCC adopted a policy under which CJC inmates were not permitted on the rock with protective custody inmates. As stated above, allowing Haywood and Cummings rock access is the functional equivalent of opening their cell doors as in *Street.* *See Street*, 102 F.3d at 813. The instant case is easily distinguishable from those cases in which a plaintiff is able to prove that an injury occurred but is unable to recover damages because there is no causal relationship between the alleged injuries and the challenged conditions of confinement. *See Doe*, 110 F.3d at 520. Finally, the Court's conclusion on proximate cause is bolstered by the unrefuted testimony of Dr. Smith that the current damage to Mr. Miller's shoulder was directly caused by the attack.

At trial, Defendants attempted to deny that the policy caused the damage by arguing that Cummings and Haywood escaped from their cells and were on the rock without permission rather than pursuant to SCCC policy.[12] Had the proof shown that Cummings and Haywood escaped from their cells by jamming the doors, Defendant could argue that Miller's injuries were the result of negligence rather than SCCC policy or custom. By asserting that the doors were jammed open,

---

**12.** Defendant did not raise this argument in its Proposed Findings of Fact and Conclu- sions of Law.

Defendant attempts to erase the causal connection between a policy allowing the inmates to rock together and the injury.

The evidence belies this contention. Haywood apparently told Sergeant Fred Jones that he ended up on the rock by picking the lock to his cell door. However, Defendant offered no evidence on this point and the Court agrees with Sgt. Jones that this is an unlikely scenario. Another major difficulty with Defendant's explanation is that on many occasions, Cummings and Haywood were granted access to the rock while other inmates were also on the rock. Indeed, this was SCCC policy prior to the attack on Miller.[13]

As stated above, the log books, which were offered to show that Cummings and Haywood were not scheduled to rock at the time of the attack, are probative of nothing and do not indicate that Cummings and Haywood escaped from their cells. Finally, there was no proof that the cell doors were broken.

Having found Defendant liable for Miller's injuries, the final task is for the Court to determine damages. Plaintiff does not suggest an amount of damages and the Defendant offered little proof at trial on the issue of damages and failed to refute Dr. Smith's testimony that as a result of the attack, Miller suffered subluxation of the right shoulder, a scalp puncture wound, and frozen right shoulder. Likewise, Defendant was unable to seriously refute Dr. Smith's conclusion that Miller now suffers a permanent six percent anatomical impairment of his right shoulder as a result of the attack. Indeed, Dr. Smith's diagnosis that Mr. Miller suffers frozen right shoulder is consistent with the diagnosis of SCCC medical personnel. Nor did Defendant refute Dr. Smith's testimony about the causal relationship between the attack and the injuries suffered by Miller. The adequacy of SCCC medical care is not challenged in this case and no

portion of the damage award is compensation based on such a claim. Finally, Defendant offered no evidence to refute Miller's contention that he is unable to lift heavy objects, suffers headaches, and has blurred vision as a result of the attack. While the Defendant argues that there are reasons to suggest that Miller's testimony regrading his injuries may not be entirely credible, the real issue is the credibility of Dr. Smith. Dr. Smith's credibility was not seriously challenged and is accepted by the Court.

While it is difficult to place a dollar amount on Plaintiff's injuries, this Court must determine an amount of damages that adequately compensates Mr. Miller for this injury. As stated above, his impairment potentially affects any activity in which Mr. Miller is required to use his right shoulder. Furthermore, this injury is permanent. While there was less conclusive evidence concerning the damage to Mr. Miller's vision as a result of the attack, the bulk of the damage award is compensation for the shoulder injuries. Taking into consideration all of these factors, the Court determines that $40,000 dollars is the appropriate amount of damages.

## IV. Conclusion

For the reasons stated above, the Court finds Defendant Shelby County liable for damages suffered by Plaintiff as a result of Defendant's deliberate indifference to Plaintiff's safety in violation of the Eighth Amendment. The Court ORDERS that Defendant pay Miller $40,000 dollars.

13. Of course, the Court realizes the fact that Haywood and Cummings were frequently granted rock access does not mean that they received such permission in this case.